IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE INTEREST OF AUSTIN B. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AUSTIN B. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MICHELLE B., APPELLANT.

Filed January 31, 2023.   No. A-22-463.

Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge. Affirmed.

Kendall Krajicek, of Law Office of Kendall K. Krajicek, for appellant.

Daniel Gubler, Deputy Douglas County Attorney, and Nikolaos Piperis, Senior Certified Law Student, for appellee.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

### INTRODUCTION

Michelle B. appeals from the decision of the separate juvenile court of Douglas County terminating her parental rights to her children, Austin B., Shelby B., and Ashley B. We affirm.

### BACKGROUND

#### PROCEDURAL BACKGROUND

Michelle is the biological mother of Austin, Shelby, and Ashley. At the time of the termination hearing in April 2022, Austin was 9 years old, Shelby was 7 years old, and Ashley was 5 years old. Roger F. is the children's biological father. The State sought to terminate Roger's parental rights to the children in these same juvenile proceedings below. He pled "no contest" to

- 1 -

the allegations against him in the motion to terminate his parental rights and he indicated a willingness to relinquish his parental rights; however, whether he ultimately relinquished or otherwise had his parental rights terminated is not apparent from our record. Because Roger is not part of this appeal, he will not be discussed further.

Austin, Shelby, and Ashley were removed from Michelle's care in February 2018 because of concerns that she neglected their physical needs and that she neglected to seek medical care despite the children having a number of injuries.

On February 23, 2018, the State filed a petition in the juvenile court alleging that Austin, Shelby, and Ashley were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because they lacked proper parental care by reason of the fault or habits of Michelle. The State specifically alleged:

A. Michelle . . . subjected said juveniles to inappropriate physical contact by Austin . . . .

B. Ashley . . . and Shelby . . . have been seen with bite marks, bruises and bumps on their heads and body [sic].

C. Michelle . . . failed to provide proper parental care, support and/or supervision for said juveniles.

D. Michelle . . . failed to provide safe, stable and/or appropriate housing for said juveniles.

E. For the above reasons said juveniles are at risk for harm.

The State also filed a motion for the immediate temporary custody of the children to be placed with the Nebraska Department of Health and Human Services (DHHS), and the juvenile court entered an ex parte custody order that same day. The children have since remained in the custody of DHHS and in foster care.

On April 4, 2018, the children were adjudicated pursuant to § 43-247(3)(a) based on Michelle's plea admissions to the allegations found in sections C and E of the petition. The allegations in sections A, B, and D of the petition were dismissed on the State's oral motion. The matter proceeded to immediate disposition. The juvenile court ordered the parties to contact "Impact from Infancy" regarding child-parent psychotherapy or parent-child interactive therapy, as deemed appropriate, or any other appropriate parenting assessment. The court also ordered Michelle to: participate in fully supervised family time; undergo a parenting assessment and psychological evaluation with IQ testing; obtain and maintain safe and adequate housing to provide for herself and her children; obtain and maintain a legal source of income to provide for herself and her children; participate fully in family support services; and participate fully in hands on parenting training and work with a parenting coach to learn appropriate parental responses to the ages and stages of development. Following a continued disposition hearing on July 17, the court also ordered Michelle to participate fully in and successfully complete an accredited domestic violence program that included foundational classes and empowerment counseling.

Numerous "Impact from Infancy Snapshot" hearings and review and permanency hearings were held between September 2018 and November 2021. Following those various hearings, the juvenile court additionally ordered Michelle to undergo psychiatric, psychological, and substance abuse evaluations; participate in individual and family therapy as recommended and demonstrate

the ability to adequately parent her children; undergo a competency evaluation; learn appropriate structure, consistency, rewards, and consequences consistent with the developmental needs of her children; and participate fully in peer-to-peer mentoring services so that she could demonstrate the ability to be self-sufficient by meeting the basic needs of all family members.

We note that on June 23, 2020, the juvenile court ordered that Michelle was to have unsupervised parenting time with her children with agency, guardian ad litem, or "CASA" drop-ins during that unsupervised parenting time. However, supervised parenting time was reinstated on April 7, 2021, and it remained supervised at the time of the termination hearing.

On December 6, 2021, the State filed a motion to terminate Michelle's parental rights to Austin, Shelby, and Ashley pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The motion alleged that: Michelle substantially and continuously or repeatedly neglected and refused to give the children or a sibling necessary parental care and protection; reasonable efforts to preserve and reunify the family failed to correct the conditions leading to the adjudication of the children under § 43-247(3)(a); the children had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Michelle's parental rights was in the best interests of the children.

TERMINATION HEARING

A hearing on the motion to terminate Michelle's parental rights was held over the course of 4 days in April 2022. The State called six witnesses to testify, and three exhibits were received into evidence. Michelle did not testify. A summary of the relevant evidence follows.

Shekita Lewis was the caseworker assigned to this family in February 2021, and she remained the caseworker at the time of the termination hearing. Lewis testified that when she took over the case, she familiarized herself with the case by reading the case files and discussing the case with her supervisor and the previous caseworker and that worker's supervisor. The children were removed from Michelle in February 2018 and remained in out-of-home care at the time of the termination hearing 50 months later.

Lewis testified that it was her understanding that when the children were removed, they were living with Michelle in a homeless shelter. The children fell and hit their heads numerous times and Austin had also pushed the children out of chairs. The shelter suggested that Michelle take the children to the emergency room to have them examined because they continually hit their heads, but Michelle did not take them for another 8 days. There were also concerns that Michelle did not redirect the children and did not give consequences for Austin's behaviors.

Lewis stated that after removal, Michelle had supervised parenting time with the children. She progressed to unsupervised parenting time in her home in June 2020, but she went back to supervised parenting time in April 2021. When Lewis was assigned to the case in February 2021, she became concerned about the children's safety during their time with Michelle. Lewis received provider reports from the agency that was providing Michelle's family support and doing the drop-ins during her unsupervised parenting time. The reports Lewis received stated that Michelle held Shelby's arms aggressively but released Shelby when asked. However, when Shelby continued "crying and screaming and flaring [sic] her arms," Michelle restrained her aggressively and again had to be asked to release her hold on Shelby. There were also reports that Michelle took the children to her mother's house on Easter and that her mother spanked Shelby; when asked,

Michelle said that it was just a tap. There were also reports from Austin that Michelle pulled his hair during a visit. Based on her concerns, Lewis spoke with her supervisor, and they agreed they needed to file a motion requesting supervised visits. Michelle went back to supervised parenting time in April 2021, and her parenting time remained supervised at the time of the termination hearing in April 2022.

Lewis stated that during her time on the case she attempted to contact Michelle "at least monthly," and "more than that if there's [sic] issues going on with visits." However, there were times when Michelle would not return Lewis' calls or texts or when Michelle would not see Lewis; Lewis stated that Michelle responded to approximately 75 percent of the phone calls and text messages. In April 2021, Michelle was angry that she had to go back to supervised visits and would not respond to Lewis' calls or text messages. In June, Lewis could not contact Michelle for a couple of weeks and thus was not able to meet with her. There were also three different occasions (dates not specified) when Lewis went to Michelle's home "for a pop-up," but Michelle would not answer the door.

Lewis testified that Michelle had been court ordered to complete psychological and psychiatric evaluations, participate in individual and family therapy, participate in family support and peer-to-peer mentoring, maintain safe and stable housing, maintain employment, and participate in her supervised parenting time. She was also ordered to attend parenting classes and learn parenting skills and techniques to help her with the children's behaviors.

Lewis stated that Michelle had completed two psychological evaluations. Michelle also worked with one therapist for individual therapy prior to Lewis' time on the case. Lewis stated that the provider's report noted a successful discharge for therapy. However, according to Lewis, there was a court order in place for Michelle to continue to engage in individual therapy because she had not addressed her past trauma. Michelle did not want to participate in additional individual therapy because she had "already done it" and "there was nothing wrong with her so she [did not] need therapy." She eventually filled out paperwork and got on the waitlist for a specific provider in May 2021 (the same provider she did therapy with the first time). Despite Lewis suggesting several other providers, Michelle refused to work with any provider other than the one that had her on a waitlist. Michelle finally started seeing a different individual therapist in January 2022.

Lewis stated that Michelle participated in family therapy, but according to the reports Lewis received from the provider, Michelle told the therapist everything was going well at visits, which was not consistent with reports Lewis received from the visitation provider. Additionally, when the family therapist left the providing agency in August 2021, Lewis tried to find another provider that had the necessary availability. When Lewis found a provider in October, Michelle refused because the therapist was a male. Lewis spoke to Michelle about engaging in family therapy, and Michelle "says she's willing to do it," "[s]he just doesn't think that she needs the help" and that it is her children that need therapy. Lewis testified that "Michelle continually states that it's the kids' fault that they're in care." Lewis had not received any report stating that Michelle successfully completed family therapy.

Lewis testified that Michelle had not successfully completed family support, which is used to help families complete court-ordered services. She was unsuccessfully discharged from four family support agencies because she did not want to work with services (other than to get help accessing pantries), would not take direction from the workers, and would not redirect her children

as needed during visits. She started working with a fifth family support agency just over 1 month prior to the termination hearing. Michelle did not successfully complete peer-to-peer mentoring.

Lewis testified that Michelle was employed, had safe and stable housing, and had been "maintaining her bills and her rent and doing great with that." However, there were "quite a few times" when Michelle's house was "extremely messy" and there were times when Michelle's house smelled "really bad."

According to Lewis, Michelle was consistent in visiting her children, other than when there were health issues or when there was an infestation of maggots in her home. However, Michelle had gone through four different visitation agencies. Michelle was unsuccessfully discharged from three of those agencies during Lewis' time on the case because Michelle was difficult to work with, was not easily redirected, was not addressing the children's negative behaviors during visits, and would not take the visitation workers' suggestions. Lewis stated that according to the visitation reports she received, Michelle's visits were "chaotic because the kids are doing whatever they want and Michelle is just sitting on the couch," "she ignores the behaviors and continues to do what she is currently doing at the time." Lewis was concerned about the children's safety because Michelle was not addressing the children's behaviors and was letting them hit each other. When Lewis spoke to Michelle about the visitation issues, Michelle told her the visitation workers were lying. Additionally, Michelle consistently blamed the children and stated that it was Austin's fault that the children were out of home, and she told the children that their behaviors were the reason that they still had not been able to come home. When Lewis spoke to Michelle about learning additional parenting skills and techniques, Michelle would say that she had already done parenting classes and knew what she was doing. However, Lewis had not seen any improvement in Michelle's interactions with the children and stated that Michelle was not able to effectively parent her children.

Lewis testified that the children "have severe behaviors." She said Austin's behaviors "consist of him hitting his siblings and also playing with his own feces and smearing it on walls and floors." Austin hitting his siblings was consistent since Lewis was assigned to the case, but "the feces and smearing it just recently started happening maybe about five months ago." Austin's behaviors escalated and he was now "also hitting smaller kids at day care, which is leading to him being suspended from day care for days at a time." Lewis stated that Shelby "also has behaviors of hitting her siblings . . . when she gets angry, she will hit them until she feels like stopping," and "when told no, she throws stuff and tears up rooms" and has done that at school and at tutoring. Shelby's behaviors have changed "for the worse." Lewis stated that Ashley "does not hit her siblings often," but she "does hit them back when they hit her." Ashley's "worst behavior is her pottying on herself." Lewis testified that the children have "extensive needs." They need love and stability, a higher level of care, positive discipline, and "[m]ostly just structure." According to Lewis, the children "need a parent who will love and take care of them, and a parent who will show them right from wrong, teach them and help them when they are having difficulties."

Lewis stated that it had been more than 4 years since the children were removed from Michelle, but the issues were still the same and Michelle had not made progress. Accordingly, Lewis opined that it would be in the children's best interests to terminate Michelle's parental rights.

On cross-examination, Lewis acknowledged that the main purpose of foster care was to provide the children with a safe and stable place to live while their parent worked toward reunification, and that an unstable, neglectful, or abusive foster placement can detrimentally affect a child's mental and behavioral health, as well as impact the speed and likelihood of a family's reunification. Lewis also acknowledged that the children had been in more than five different foster or respite placements since being removed from Michelle in 2018. Additionally, the children experienced educational neglect while in the custody of DHHS and placed in foster care, and the children also reported physical neglect and/or abuse in at least one foster placement.

Megan Heinke testified that she provided family support to Michelle in May and June 2021. Heinke tried to help Michelle with her children's behaviors by providing redirection when needed; "[t]here were times" that Michelle was receptive to redirection, but not always. Heinke stated that there "were a lot of times" when Michelle would not acknowledge a child who was speaking to her. Michelle was resistant to completing a budget, telling Heinke that her income varied and "she didn't feel the need to complete a budget because the case manager already had that information." Heinke explained to Michelle that she needed to complete specified goals to reunify with her children, but that did not change Michelle's willingness to engage with Heinke. Michelle was unsuccessfully discharged from family support with Heinke's agency in June 2021 for a lack of engagement.

Jessica Rowe testified that she was assigned as Michelle's family support worker in July or August of 2021. Rowe called and texted Michelle to introduce herself and to ask when they could meet. Michelle's responses were "excessive in length, and it was a significant amount of rambling that informed [Rowe] that she did not need family support services," and "what she did need was food stamp vouchers and bus passes," "and a successful discharge from the court." Because Michelle refused to meet, Rowe informed her supervisor that there was a refusal of services.

Reagan McKenna testified that she supervised Michelle's parenting time from May to August or September 2021, during which Michelle had parenting time 4 days per week. McKenna also provided family support to Michelle starting in July or August 2021. When McKenna called Michelle and told her that she would be taking over family support, "Michelle basically stated . . . that she just needs a successful discharge," "[t]hat she has been through family support already."

McKenna provided family support with Michelle alone and when the children were present, but mostly when the children were present because they were working on Michelle's parenting skills. For example, McKenna tried to assist Michelle in potty training the youngest child, but Michelle did nothing to help and did not incorporate any of McKenna's suggestions. McKenna also tried to set up parenting classes, but Michelle was unwilling to do them, saying she had already done them. McKenna did not see Michelle incorporate any of the skills she was trying to teach her.

During Mckenna's time on the case, the children's behaviors included "[l]ots of yelling, throwing things," crying, the girls soiling themselves, and "there was just chaos"; the visits were like that a "majority of the time." When asked to describe Michelle's interactions with the children, McKenna responded, "Minimal." McKenna stated "[Michelle] wanted to do what I believe their therapist at the time told her, which was . . . ignore the behavior," "[b]ut it just seemed like it was taken to an extreme." McKenna had to personally intervene "every time" the children acted out.

In addition to ignoring bad behaviors, Michelle also ignored the children. For example, she would not reply to the children when they were talking to her, or they would try to get her attention and "she just wouldn't give it to them." Michelle also needed to be redirected "[e]very visit on something," but when McKenna tried to redirect her, Michelle would not try McKenna's suggestions and said that she had already tried them.

McKenna felt like she "was abusing the kids by taking them on the visit" because changes were not happening and the children's behaviors started to increase; "it just seemed to be hurting them more," "like they just wanted to so badly be loved," but McKenna did not see Michelle showing the children love. McKenna's agency discharged Michelle from visitation and family support in August or September 2021 for failure to comply.

Ashley Nee testified that she supervised some of Michelle's parenting time from September 2021 to March 2022, when Michelle had parenting time 1 day per week. Nee testified that during visits, Michelle cooked for the children and interacted with them by playing games or Legos with Austin and playing dolls or painting nails with the girls. When Nee redirected Michelle, Michelle "was fine with it" and took the advice given to her. During Nee's involvement with the family, Ashley's potty training progressed, but Austin started soiling himself. When asked if she observed the family "talking, laughing, and cuddles [sic]," Nee said, "Yes." She also observed Michelle showing the children affection. Nee did not know why her agency discharged Michelle from parenting time services.

Rowe—with whom Michelle previously refused to engage in family support services in July or August 2021—subsequently began employment with a different agency and was again assigned to provide family support to Michelle at the end of October 2021. Additionally, Rowe supervised Nee, who was providing visitation services to Michelle.

While doing a visitation drop-in in her supervisory capacity in October 2021, Rowe introduced herself to Michelle as the family support worker. Michelle brought up that she needed a successful discharge from the juvenile court, but she was receptive to Rowe. Rowe and Michelle set up a meeting for the next week to go over different needs and services for family support. At that meeting, Michelle requested food pantry vouchers and bus passes, and Rowe referred her to a program to obtain toys for the upcoming holiday. Rowe's biggest goal was to assist Michelle in learning to redirect the children and help her with parenting skills. At the time, Michelle was "very receptive."

Rowe next met with Michelle in mid-November 2021 during her parenting time with the children; Nee was the visitation worker. When the children arrived, they "immediately went to the bedroom . . . and pulled out all their toys and just trashed the living room"; "[t]hey had toys to the point that you were literally stepping up over — almost on your tiptoes to get over the toys to get to the kitchen." The children refused to listen when Michelle tried to get them to sit down and eat dinner. Rowe stated, "Michelle just quietly would sit back and observe, not intervene." When Rowe suggested they create a schedule so that every time the children came to Michelle's house they could see the schedule on the wall to know what was going to happen when, "Michelle refused." Rowe said, Michelle "informed me that it would not work because [the children] do not come to her house enough to learn a consistent routine and, therefore, she would not be implementing something like that until they were home."

Rowe stated that when the children would ask Michelle for help with homework, Michelle would say she could not help. Rowe talked to Michelle and tried to redirect her, but "she would get very frustrated, and she proceeded to tell me that . . . she is developmentally delayed. . . . [a]nd her children are developmentally delayed." When Rowe asked Michelle to not say things like that in front of the children, Michelle's response was "'[W]hat? It's not like I'm calling them retarded.'" Michelle got upset and asked Rowe to leave, stating that "this was not a good idea and we will no longer be doing these on her visit."

Rowe's concern was that Michelle was "continually pushing these developmental delays that she always says she has on to her own children"; "[s]he is mentally abusing these children, and she is not providing them the care and the comfort"; "[t]hese children are screaming for help, and Michelle never addresses those needs." Based on Michelle's responses to Rowe and her interactions with the children, Rowe did not believe that Michelle was willing to continue working with family support. Rowe stated that Michelle utilized family support to obtain free resources but was not looking for family support to help her build up her parenting skills. Rowe's agency discharged Michelle from family support at the end of November or the beginning of December 2021 for a lack of engagement.

Rowe supervised visitation worker Nee from the end of October 2021 until the agency discharged Michelle from visitation services in February or March 2022. Rowe reviewed Nee's case notes and met with her weekly or biweekly, and then Rowe would prepare a monthly summary report. According to Rowe, "Visitation was going poorly because the children were showing signs of decline and Michelle was putting in less of an effort when preparing her home and preparing for the time for the children to be there." Initially, the children were showing some behaviors on the car ride over to the visit. Then Nee "had them on a really good path, to the point they used to require that the children have two workers for transport and [Nee] was able to get them down to one." Then, "all of a sudden the children started to have these behaviors of fighting in the car, screaming at the top of their lungs," and crying; "[w]e took a step backwards."

Rowe was also getting reports of concerning behaviors during visits. For example, "Austin has now started pooping himself on a regular basis" and Michelle was not engaging with him and asking him why it was happening; she simply told him to go clean himself up. On one visit, feces were observed on the bedding and Michelle "immediately started accusing the children" even though the children had not been out of the visitation worker's sight. Michelle also showed the children a video of her dancing on a pole that was installed in her bedroom; after "a little bit of resistance," the worker was able to redirect Michelle and get her to stop the video. On cross-examination, Rowe confirmed that Michelle was clothed in the video.

Rowe was concerned about continuing to provide Michelle with supervised visitation because "the case had stalled," "and the children were showing signs that they have gone backwards." Rowe believed that "Michelle is a barrier" because she "is incapable of providing for those children" to "meet their extensive, extensive needs." Rowe stated, "it felt like we were hurting the children," and "[w]e are not in the business of carrying on visitations that aren't moving forward, that are actually becoming detrimental." Rowe "chose to discharge the case based on the fact that it appeared like we were enabling . . . the continued mental abuse of these children." Rowe's agency discharged Michelle from visitation services in February or March 2022.

Felicia C. testified that she had been the children's foster mother since August 2021. When the children first came to live with her, all three had "a lot of issues." Felicia stated that Shelby "would bump her head a lot on the floor," "[t]here was a lot of teasing between the three" children, "Austin picked on the girls a lot," and Ashley was not potty trained. Additionally, "[t]here were issues at day care with all three," and "[t]hey were actually kicked out of one day care." When asked what kind of issues the children were having at daycare, Felicia stated that "it's more of authority" and the children had issues with people telling them what to do. She stated,

> If they didn't want to do what they were told, then they would hit the teacher. They would hit other kids, spit on kids, destroy the day care by tearing things up, walls. And when they were being transported, they were kicking the back of the seat where the driver was, where they would have to pull over multiple times. And then there were times they wouldn't come out of school. The day care provider would have to go in and get them. So there was a lot of issues where they just — they couldn't do it any longer and had to revoke them.

Felicia used to get calls almost every day from the school or daycare but had only gotten one call in the last month.

Felicia also experienced issues with the children not listening and doing what they were told to do, but it had gotten "[a] lot better" and there were now only minor issues. When asked what she believed led to the change in the children's behavior over the past few months, Felicia responded, "It's a lot of structure, consistency, rewarding them . . . when they are making progress[,] . . . but mostly . . . it's just a consistency with them." Following visits with Michelle, the children "have issues maybe on the way from [Michelle's] house to my house in the car," "[b]ut once they are back home they are fine."

### JUVENILE COURT'S DECISION

In an order entered on May 24, 2022, the juvenile court found by clear and convincing evidence that statutory grounds for termination of Michelle's parental rights existed pursuant to § 43-292(2), (6), and (7). The court also found that the State met its burden of rebutting the presumption that Michelle was a fit parent, and that termination of Michelle's parental rights was in the children's best interests. Accordingly, the court terminated Michelle's parental rights to Austin, Shelby, and Ashley.

Michelle appeals.

### ASSIGNMENTS OF ERROR

Michelle assigns that the juvenile court erred in finding that (1) she was an unfit parent, and (2) termination of her parental rights was in the children's best interests.

### STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

ANALYSIS

STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Michelle's parental rights under § 43-292(2), (6) and (7). The juvenile court found that all three grounds existed by clear and convincing evidence. Michelle does not challenge the court's finding of a statutory ground for termination, however, for the sake of completeness, we briefly review the court's finding.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*. In this case, the children were removed from Michelle's care in February 2018. They remained out of home through at least April 2022, when the termination hearing was held; this satisfies the 15-out-of-22 months period.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating the parental rights of Michelle. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra*. We next consider whether termination is in the children's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Michelle did not successfully comply with the various court-ordered services. Although she reluctantly participated in some individual and family therapy, she did not feel that it was necessary even though there were still issues to be addressed. She was unsuccessfully discharged from four family support agencies because she did not want to work with services,

would not take direction from the workers, and would not redirect her children as needed during visits. Michelle was consistent in visiting her children; however, the visits were described as chaotic and Michelle would not address the children's behaviors during visits, did little to intervene, and would otherwise generally ignore the children. She went through four different visitation agencies and was unsuccessfully discharged from three of those agencies.

Additionally, Michelle blamed the children and their behaviors as the reason why they had not been able to come home. When workers spoke to her about learning additional parenting skills and techniques or parenting classes, Michelle would say that she already knew what she was doing. Nee was the only worker to testify that Michelle positively engaged with the children and accepted redirection. However, Lewis had not seen any improvement in Michelle's interactions with the children and stated that Michelle was not able to effectively parent her children. Additionally, Nee's supervisor (Rowe) and the previous visitation worker (McKenna) testified that they felt like continued visitation with Michelle was itself subjecting the children to a form of abuse.

In her brief, Michelle notes that some of the children's behaviors coincided with factors outside of her control, e.g., educational neglect while the children were in the custody of DHHS and placed in foster care. Those outside factors are certainly concerning but they do not explain or justify Michelle's own shortcomings noted above.

The children had been out of Michelle's care for more than 4 years at the time the termination hearing concluded but, according to Lewis, the issues were still the same and Michelle had not made progress. Lewis opined that it would be in the children's best interests to terminate Michelle's parental rights. Lewis testified that the children need love and stability, a higher level of care, positive discipline, and "[m]ostly just structure." They "need a parent who will love and take care of them, and a parent who will show them right from wrong, teach them and help them when they are having difficulties." We agree that the children have all of those needs and that Michelle has been unable or unwilling to provide for those needs. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. The State proved that Michelle was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the children's well-being. See *In re Interest of Leyton C. & Landyn C., supra*. We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Michelle's parental rights.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Michelle's parental rights to Austin, Shelby, and Ashley.

AFFIRMED.